# In the United States Court of Federal Claims

|  |  |
|---|---|
| VALUE RECOVERY HOLDING, LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>*Defendant.* | No. 21-1467<br>(Filed: August 1, 2022)<br>(Re-issued: August 23, 2022)* |

*Suzanne Sumner*, Dayton, OH, for Plaintiff.

*Michael Damien Snyder*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

**OPINION AND ORDER**

**LERNER,** *Judge*.

      This is a case under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7101.  Plaintiff, Value Recovery Holding, LLC ("VRH"), seeks review of the Department of Education ("ED" or "the Department") contracting officer's final decision to deny its claim for allegedly reasonable and allocable costs incurred prior to the Department terminating the Contract for the convenience of the government.  The Government filed a Motion to Dismiss the Amended Complaint under Rule 12(b)(6) of the United States Court of Federal Claims ("RCFC"), alleging that VRH fails to state a claim upon which relief can be granted because the costs it seeks to recover are not allowable under the terms of the Contract or the Federal Acquisition Regulation ("FAR").  Def.'s Mot. to Dismiss the Am. Compl. ("Def.'s Mot."), ECF No. 21.  Moreover, the Government asserts that VRH assumed the risk that the particular costs it incurred would not be reimbursable under the Contract.  In contrast, VRH alleges that the costs were necessary, reasonable, and allocable given the circumstances and language of both the Contract and stop work order the Department issued prior to termination.

      For the reasons set forth below, the Motion to Dismiss is **DENIED**.

---

* The Court initially filed this opinion under seal to allow the parties to propose redactions.  The Court has incorporated the proposed redactions in this public version of the opinion.  Words or phrases that are redacted have been replaced with [ * * * ].

I.      **Factual Background**[1]

   A.      **The Contract**

On December 9, 2016, the Department awarded VRH a contract ("the Contract"), which was one of seven contracts under a multiple-award, indefinite delivery/indefinite quantity ("IDIQ") vehicle for student loan debt collection services ("the Umbrella Contract"). Am. Compl. ¶ 11, ECF No. 15. The Contract was valued at $417,100,002 and contemplated a five-year base period of performance with one five-year optional extension. *Id.* ¶ 6. ED would assign work under the Contract by issuing task orders to awardees for one-year periods of performance. *Id.* The work to be performed on each task order, which would involve collecting payments from delinquent student loan accounts, was outlined at Contract Section B.3 and the attached Schedule. Pl.'s Ex. 2 at 3, 6, 72–73 (the Contract), ECF No. 15-2. The Contract established fixed prices for commissions and fees that contractors could earn associated with each discrete line item. *Id.*

Like the IDIQ contracts awarded under the Umbrella Contract, the Solicitation and the Contract required VRH to obtain an Authorization to Operate ("ATO") from the Department's Office of Federal Student Aid ("FSA") in order to be eligible to receive delinquent student accounts for collection (i.e., task orders). *Id.* ¶ 7, 12. An ATO is an information security requirement designed to ensure compliance with certain cyber security standards. *Id.* ¶ 15 (quoting Pl.'s Ex. 3 at 28–29 (Performance Work Statement, "PWS"), ECF No. 15-3); *see also id.* ¶¶ 8–9. For example, an awardee's information system must have adequate controls to protect the confidentiality, integrity, and availability of data shared between the government and a contractor, including third-party data. *Id.* ¶ 8. "[O]btaining an ATO is a complex, highly technical, and resource-intensive process." *Id.* ¶ 10. With respect to the ATO requirement, the Contract stated:

> **C.2.41 Contractor Performance Monitoring and Evaluation (Allocation Methodology)**
> In the first few months of performance under the initial task orders, the Department intends to transfer a fixed number of accounts to every contractor. The number of transfers will not necessarily be equal and the [Department] may make adjustments based on a variety of factors, including but not limited to the Contractors [sic] ability to secure an Authority to Operate (ATO), staffing levels, etc. After those first few months, the Department will implement the Contractor Performance Monitoring and Evaluation (CPME) system to monitor and evaluate each contractor's on-going performance, on a quarterly basis.

Pl.'s Ex. 2 at 54 (the Contract).

---

[1] This section does not set forth factual findings. Rather, it describes the case in terms of the facts alleged in the Amended Complaint, which must be taken as true, with all reasonable inferences construed in Plaintiff's favor on a motion to dismiss. *See Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).

The Contract's Performance Work Statement ("PWS") contains additional requirements regarding the ATO, explains how the Contract operates for awardees who already have a standing ATO versus those who do not, and generally indicates the complexity of the ATO process. Am. Compl.¶¶ 13–15, 18–19; Pl.'s Ex. 3 (PWS). Notably, it states:

> FSA's initial transfer will be approximately 5,000 to 15,000 accounts after approval of the Authorization to Operate (ATO) and upon successful implementation of the deliverables as outlined in Section 5, Contract Deliverables. Though FSA has the final determination on all transfer amounts, the first several transfers may be level until after the CIE.

Pl.'s Ex. 3 at 4 (PWS). The "CIE" refers to the Contract Implementation Evaluation process, which is "necessarily related to the ATO." Am. Compl. at ¶ 18. It assesses a contractor's "system related operations, the interface between the Contractor's computer system(s) and the FSA-System, and the administrative interface between the Contractor and FSA." Pl.'s Ex. 3 at 5 (PWS). The PWS provides that failure to timely complete the CIE process results in account transfers being stopped, only to resume once the CIE is completed. Pl.'s Ex. 3 at 6 (PWS). Plaintiff alleges these requirements imposed "severe consequences for an IDIQ awardee who fails to quickly obtain an ATO or to otherwise satisfy the CIE evaluation process shortly after contract award." Am. Compl. ¶ 20.

The PWS also explains that contractors whose systems are already in operation under an ATO have their systems "entered into FSA's Continuous Security Authorization (CSA) program and will not have a specific reauthorization date." Pl.'s Ex. 3 at 29 (PWS). Such contractors can immediately begin receiving accounts. *See id.* at 28–29; Am. Compl. ¶ 15. Conversely, contractors without an ATO must first "complete a FISMA [Federal Information Security Management Act of 2002] compliant security authorization and receive a formal ATO prior to receiving data." *Id.* This imposes increasingly technical demands, requiring contractors to "use NIST's risk management framework and use an independent source approved by FSA's ISSO [information system security officer] to perform a full NIST SP 800-53 controls' test and mitigate all deficiencies to a low level of risk prior to receiving a formal ATO." *Id.* As the only non-incumbent of the seven IDIQ awardees, VRH was also the only one that did not already possess a standing ATO and was not immediately eligible to receive student loan accounts. Am. Compl. ¶¶ 11, 16. Plaintiff argues this placed it at a significant disadvantage compared to other IDIQ awardees. *Id.*

### B. Bid Protest History, the Stop Work Order, and Termination of the Contract for Convenience

On December 21, 2016, VRH learned that two bid protests were filed with the Government Accountability Office ("GAO") challenging awards made under the Solicitation. *Id.* ¶ 22. On December 27, 2016—seven days after the protests were filed and eighteen days after the original award—the Government issued a stop work order pursuant to 48 C.F.R. ("FAR") § 52.233-3, *Protest After Award*. *Id.* ¶ 30. The stop work order states:

3

> VRH is hereby directed to stop performance of any and all work called for by the contract until further notice. VRH must take all reasonable steps to minimize the costs allocable to the work covered by this order during the period of work stoppage. VRH shall make no further commitments for work subject to this order. VRH shall not attempt to make delivery of any item or services required under the Contract and the Department will not accept any such delivery. VRH shall notify any subcontractor of this order and direct them to minimize any costs allocable to the work covered by this order.
>
> Upon resolution of the protest, the Department will provide additional instruction regarding work under this Contract and any further action to be taken.

Pl.'s Ex. 4 (stop work order), ECF No. 15-4.

Ultimately, the December 9, 2016 award was protested by 16 unsuccessful offerors at GAO, which sustained the protests in part and denied them in part. Am. Compl. ¶ 23. Some of the protestors removed to this Court. *Id.* ED took corrective action to remedy its evaluation process in response to the various protests, leading to multiple Solicitation amendments and the re-evaluation of proposals. *Id.* ¶ 24.

On January 11, 2018, approximately thirteen months after the initial awards, the Department terminated all seven contract awards for the convenience of the government pursuant to FAR 52.212-4(*l*), *Contract Terms and Conditions—Commercial Items* (Oct. 2014) - Tailored. *Id.* ¶¶ 25, 37; *see* Pl.'s Ex. 5 at 1, (November 5, 2019 Termination Settlement Agreement), ECF No. 15-5. The termination for convenience clause at FAR 52.212-4(*l*) provides:

> The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

The Department issued two new contract awards after corrective action and re-evaluation (neither to VRH), resulting in new bid protests filed with this Court in February 2018. Am. Compl. ¶¶ 25–26. On May 3, 2018, the Department also terminated the two new contracts for the convenience of the government, then cancelled the entire private debt collection procurement. *Id.* ¶ 27. Additional litigation challenging the cancelled procurement ensued. *Id.*

### C. Costs Incurred, Termination Settlement Attempts, and the Contracting Officer's Final Decision

In total, 401 days elapsed between contract award (December 9, 2016) and ED's termination of the Contract for the convenience of the government (January 11, 2018). *Id.* ¶ 28. During that time, VRH incurred costs that it believes are reasonable and allocable to the Contract, and thus recoverable under the termination for convenience clause. *Id.* ¶ 1. The incurred costs fall into three relevant time periods: (1) between contract award and the issuance of the stop work order; (2) between the issuance of the stop work order and contract termination; and (3) after termination. *See id.* ¶¶ 29, 48, 55, 57. VRH requests that the Court award it the following costs related to obtaining an ATO, which it incurred during the first two periods: [ * * * ]. *Id.* ¶ 55. It also requests $[ * * * ] for termination settlement preparation costs incurred during the third period. *Id.* In total, VRH requests $1,414,063 plus CDA interest as of May 26, 2020, the date on which it converted its Request for Equitable Adjustment ("REA") claim to a CDA claim. *Id.* ¶¶ 55, 65 n.2.

In February 2018, VRH informally attempted to recover its termination costs, but withdrew its request after preliminary discussions with the Government and sought additional time to review its costs. *Id.* ¶ 39. The parties continued to correspond over the following months. *Id.* On June 12, 2018, VRH submitted its first REA for its termination costs, the vast majority of which were for employee wages associated with preparing to obtain an ATO from FSA and retaining an hourly staff to perform the Contract once the stop work order was lifted. *Id.* ¶ 40. On December 5, 2019, the Department responded to the REA, disallowing all requested costs except for those associated with the preparation of VRH's termination settlement proposal. *Id.* ¶ 41; Pl.'s Ex. 5 at 2 (November 5, 2019 Termination Settlement Agreement).

Further negotiations ensued, and on March 26, 2020, VRH submitted a revised REA that reduced the requested termination settlement amount to $1,414,063, which is the amount it now requests from this Court. Am. Compl. ¶ 45; Pl.'s Ex. 7 (March 26, 2020 Termination Settlement Proposal), ECF No. 15-7. VRH provided documentation allegedly showing that it took "reasonable steps to minimize the costs it incurred after contract award to only those that were necessary and to which it was entitled to compensation pursuant to FAR 52.212-4(*l*)." Am. Compl. ¶ 47. These costs were incurred between contract award (December 9, 2016) and the stop work order (December 27, 2016), as well as during the pendency of the stop work order. *Id.* On May 26, 2020, after the contracting officer again refused to compensate VRH for any costs beyond settlement proposal preparation costs, VRH converted its REA claim into a certified CDA claim, prompting a contracting officer's final decision ("COFD"). *Id.* ¶ 49.

On June 22, 2020, ED issued the COFD with a final settlement determination of $[ * * * ] to cover only the termination settlement preparation costs. *Id.* ¶ 52. The Department "rejected all other claimed costs on the basis that the costs were either incurred after the stop work order was issued or not allocable to the Contract pursuant to FAR 31.201-4(a)." *Id.* Plaintiff claims that "[t]he COFD was unreasonable, an abuse of discretion, and/or not in accordance with the terms of the Contract and the relevant law and facts" because it "ignores the fact that a stop work

order is not an absolute bar to the recovery of incurred costs under certain, limited circumstances, which are present in this case." Am. Compl. ¶ 53.

VRH explains that even if it had requested an ATO through FSA prior to contract award, in an attempt to avoid incurring those costs under the instant Contract, its request would have been denied because FSA only considers current contract holders for an ATO. *Id.* ¶ 17. Thus, Plaintiff alleges it had to "undertake substantial preliminary work" after contract award to obtain an ATO to be eligible to receive student loan account transfers (i.e., assigned task orders under the Umbrella Contract). *Id.*

Plaintiff further claims that its CEO at the time "repeatedly contacted the cognizant Contracting Officer to seek clarification regarding the language of the stop work order to ensure VRH was appropriately minimizing costs." Am. Compl. ¶ 33. Specifically, the CEO "sought confirmation of VRH's understanding that preparatory activities, such as those involved in obtaining an ATO, were not 'work' as contemplated by the stop work order," and that "costs associated with these preparatory activities would be appropriately allocable to the contract during the stop work order because they had to be completed prior to performing the contract work." *Id.* ¶ 34. Plaintiff alleges the Contracting Officer ignored its requests and "never told VRH to stop these preparatory activities" or that "the costs associated with these preparatory activities were unallowable pursuant to the stop work order." *Id.* ¶ 35. VRH alleges the contracting officer's silence "effectively confirmed" its understanding described above, so it moved forward with the ATO process. *Id.* ¶ 36.

       **D.**    **Procedural History**

On June 14, 2021, Plaintiff filed its original Complaint in this Court. Compl., ECF No. 1. After the Government filed a Motion to Dismiss, Plaintiff filed an Amended Complaint. Def.'s Mot. to Dismiss the Compl. "Def.'s First Mot.", ECF No. 14; Am. Compl. Plaintiff then filed a Response to the Government's original Motion to Dismiss, stating that it should be denied as moot because the Amended Complaint controls the case moving forward. Pl.'s Resp. to Def.'s First Mot., ECF No. 16. The original Motion to Dismiss is still pending.

In its Amended Complaint, Plaintiff requests that this Court award $1,414,063, plus pre- and post-judgment interest, costs, attorneys' fees, and any other relief, including equitable relief, that the Court deems just and proper. Am. Compl. ¶¶ 71, A–D. On February 2, 2022, the Government filed a Motion to Dismiss the Amended Complaint pursuant to RCFC 12(b)(6). Def.'s Mot.

**II.**    **Jurisdiction**

"Jurisdiction is a threshold matter and a case can proceed no further if the court lacks jurisdiction to hear it." *Schmidt v. United States*, 89 Fed. Cl. 111, 118 (2009) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). Therefore, the Court has the duty "to examine its jurisdiction over every claim before it assumes jurisdiction over the claim." *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed. Cir. 1998).

The Tucker Act grants the Court of Federal Claims jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Because the Tucker Act only waives sovereign immunity and does not create substantive rights, a plaintiff must identify a separate source of law that can be fairly interpreted as creating a right to money damages. *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (first citing *United States v. Mitchell*, 463 U.S. 206, 216 (1983); and then citing *United States v. Testan*, 424 U.S. 392, 398 (1976)); *see also Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990) (explaining that, for a claim under the Tucker Act that is based on a contract, "the contract must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract"). The Act specifically grants this Court "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under" the Contract Disputes Act ("CDA"). 28 U.S.C. § 1491(a)(2); *see also* 41 U.S.C. § 7102(a) (providing that the CDA applies to "any express or implied contract . . . made by an executive agency for . . . the procurement of services"). Tucker Act jurisdiction over CDA claims extends to "dispute[s] concerning termination of a contract." 28 U.S.C. § 1491(a)(2).

Even "[i]f a plaintiff meets the jurisdictional requirements of the Tucker Act, the plaintiff also must demonstrate compliance with the mandatory requirements of the Contract Disputes Act." *Crewzers Fire Crew Transp., Inc. v. United States*, 111 Fed. Cl. 148, 153 (2013), *aff'd*, 741 F.3d 1380 (Fed. Cir. 2014). Accordingly, the CDA requires that a contractor bring an action in federal court "within 12 months from the date of receipt of a contracting officer's decision." 41 U.S.C. § 7104(b)(3)); *see Raytheon Co. v. United States*, 747 F.3d 1341, 1354 (Fed. Cir. 2014) ("[C]ontract claims, whether asserted by the contractor or the Government, must be the subject of a contracting officer's final decision."). Further, this Court's jurisdiction over a CDA claim "requires both a valid claim and a contracting officer's final decision on that claim." *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citing *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541–42 (Fed. Cir. 1996)).

The Court has jurisdiction over Plaintiff's Amended Complaint. Plaintiff brings its case under the CDA, 41 U.S.C. § 7101, seeking review of the contracting officer's final decision to deny VRH's claim. Am. Compl. ¶ 1. From 2018 to 2020, VRH and the Department attempted to reach an agreement on VRH's REAs for costs incurred during the stop work order. *Id.* ¶¶ 40–48. Then, in May 2020, after failed negotiations, VRH converted its most recent REA into a properly certified claim under 41 U.S.C. § 7103(b) and FAR 33.207 and sought a COFD. *Id.* ¶ 49. On June 22, 2020, the Department provided the COFD. *Id.* ¶ 52. Plaintiff filed its Complaint in this Court on June 14, 2021. Compl., ECF No. 1. Jurisdiction is proper in this Court under the Tucker Act and CDA because the case arises from a contract between VRH and the United States (acting through the Department), there was a valid claim and COFD, and Plaintiff filed its Complaint in this Court within 12 months of receiving the COFD.

### III.  Standard of Review

A motion to dismiss under RCFC 12(b)(6) for failure to state a claim addresses the Court's ability "to exercise its general power with regard to the facts peculiar to the specific

claim." *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999). Denial of a Rule 12(b)(6) motion to dismiss is warranted when the complaint presents "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Granting a Rule 12(b)(6) motion to dismiss "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). A court considering a motion to dismiss must accept all well-pled facts as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007) (collecting cases); *Pixton v. B & B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed. Cir. 2002). Importantly, under this standard, a plaintiff is not required to conclusively prove that it is entitled to a legal remedy. Rather, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

**IV.    Motion to Dismiss the Amended Complaint**

The Government requests that the Court dismiss Plaintiff's Amended Complaint pursuant to RCFC 12(b)(6). *See* Def.'s Mot. at 1. It argues that the Amended Complaint fails to state a claim because the Contract did not "provide for payment" of the ATO, the costs are not recoverable under the FAR, and VRH assumed the risk when it incurred the cost to obtain one. *Id.* Conversely, VRH argues that the costs are recoverable under the applicable termination for convenience clause and the terms of the stop work order because the costs were necessary and reasonable. Am. Compl. ¶ 1; Pl.'s Resp. at 6.

Generally, a termination settlement "should compensate the contractor fairly for the work done and the preparations made for the terminated portions of the contract," FAR 49.201(a), including reasonable costs resulting from any stop work order, FAR 52.233-3(c). The assessment of whether costs are recoverable "is a matter of judgment and cannot be measured exactly." FAR 49.201(a). Whether VRH's costs are recoverable under the termination for convenience clause turns on whether the costs were reasonable, attributable to the termination of the Contract, and could not have been reasonably avoided. FAR 52.212-4(*l*). Under the stop work order, recoverable costs must be allocable to the work covered by the order, result from the stop work order, and must not constitute performance. FAR 52.233-3; Pl.'s Ex. 4 (stop work order). VRH must also demonstrate that it took all reasonable steps to minimize costs. Pl.'s Ex. 4 (stop work order); FAR 52.233-3. VRH is required to show that its ATO costs incurred between contract award and the issuance of the stop work order met the requirements under the termination for convenience clause, whereas costs incurred during the stop work order are subject to the requirements under both the termination for convenience clause and the stop work order (including FAR 52.233-3).

For the following reasons, the Court finds that Plaintiff's First Amended Complaint plausibly demonstrates VRH's ability to recover at least those costs it incurred after contract award and prior to the stop work order. The Amended Complaint states a claim for these costs, as well as the costs incurred during the stop work order. A closer examination of the record is warranted as to both. Accordingly, the Motion to Dismiss must be denied.

### A. Termination for Convenience Clause

In general, a termination for convenience clause allows the Government to terminate a contract and provide the contractor with an avenue for recovering costs incurred under a contract. *See, e.g.* FAR 2.101 (*Termination for convenience*); 49.201. When the Government exercises this power, "[a] contractor is not supposed to suffer as the result." *Jacobs Eng'g Grp., Inc. v. United States*, 75 Fed. Cl. 752, 758 (2007), *aff'd*, 263 F. App'x. 875 (Fed. Cir. 2008) (quoting *Jacobs Eng'g Grp., Inc. v. United States*, 434 F.3d 1378, 1381 (Fed. Cir. 2006)). Indeed, "the overall purpose of a termination for convenience settlement is to fairly compensate the contractor and to make the contractor whole for the costs incurred in connection with the terminated work." *Nicon, Inc. v. United States,* 331 F.3d 878, 885 (Fed. Cir. 2003); *see also* FAR 49.201 ("A settlement should compensate the contractor fairly for the work done and *the preparations made* for the terminated portions of the contract . . ." (emphasis added)).

Recoverable costs are determined by the contract terms. *See OK's Cascade Co. v. United States*, 97 Fed. Cl. 635, 646 (2011), *aff'd*, 467 F. App'x 888 (Fed. Cir. 2012) ("Because a termination for convenience is an authorized action under the contract, the costs that a contractor can recover under a termination for convenience are dictated by the terms of the parties' agreement."). When a contract is terminated for the convenience of the government, "the contractor is entitled to recover costs allowed by the contract and FAR provisions incorporated therein, but should not expect to be placed in a better position than had the contract run its normal course and the termination not transpired." *Id.* at 644. Relying on *OK's Cascade*, the Government argues that the applicable terms of the Contract upon which VRH can recover are limited to the line items listed in Contract Section B.3. Def.'s Mot. at 7, 13 (saying "performance fees were the only contractual basis for VRH to be paid"). This reliance is misplaced. That case identified the "terms of the parties' agreement" under which the contractor could recover with reference to the termination for convenience clause incorporated into the contract at issue. *OK's Cascade*, 97 Fed. Cl. at 646–47 (analyzing recoverable costs based on the termination for convenience clause at FAR 52.249–2). Thus, the termination for convenience clause present here, FAR 52.212-4(*l*), is the relevant provision that informs which costs are recoverable under the Contract.

Under FAR 52.212-4(*l*), a contractor may be entitled to recovery of costs under three categories: (1) "work performed under the contract prior to a notice of termination," (2) "settlement expenses," and (3) "costs resulting from the termination." *ACLR, LLC v. United States*, 157 Fed. Cl. 324, 332–33 (2021) (quoting *Dellew Corp.*, ASBCA No. 58538, 15-1 BCA ¶ 35,975 at 175,783); *see also Red River Holdings, LLC v. United States*, 802 F. Supp. 2d 648, 662 (D. Md. 2011). Concurrently, FAR 52.212-4(*l*) provides that "the Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided." FAR 52.212-4(*l*).

Here, because ED terminated the Contract pursuant to FAR 52.212-4(*l*), VRH's claim must be for recovery of costs for work performed prior to the notice of termination and/or costs that (1) are reasonable; (2) are a result of the termination; and (3) could not have reasonably been avoided. FAR 52.212-4(*l*) (providing that a contractor shall be paid for "work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate . . . have

9

resulted from the termination" and that "[t]he Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided."); Am. Compl. ¶ 37. The first clause of FAR 52.212-4(*l*), relating to recovery of a percentage of cost of the work performed, does not apply to VRH's ATO costs because, as discussed below, the expense to obtain an ATO likely is not "work" under the Contract. Rather, the ATO costs are subject to the latter clause, which requires that the costs be reasonable and a result of the contract termination, in addition to the limitation that they must not have been reasonably avoidable. *See* FAR 52.212-4(*l*).

VRH plausibly alleges that the costs it seeks to recover are "reasonable charges," subject to the other aforementioned conditions. *See* Am. Compl. ¶¶ 29, 47; FAR 52.212-4(*l*). Contract appeals boards generally interpret "reasonable charges" as costs that are separate from the "charges associated directly with the completed work." *ACLR*, 157 Fed. Cl. at 332–33. These costs include "such things as 'start-up costs; unrecovered running expense; . . . and other charges that are normally paid pursuant to a long form termination for convenience provision to fairly compensate a contractor.'" *Id.* at 333 (quoting *SWR*, 15-1 BCA ¶ 35,832 at 175,223 (citing cases construing the word "charges")). VRH cites to persuasive authority in which preparatory costs that are incurred to "be in a state of readiness" have been considered reasonable. Am. Compl. ¶ 60 (citing *4H Constr. Corp.*, ASBCA No. 59977, 19-1 B.C.A. ¶ 37, 317 (finding the plaintiff "entitled to compensation for any direct or indirect costs it reasonably incurred in preparing to perform the contract prior to the issuance of the notice to proceed, plus profit on those preparatory activities.")); *see also Am. Eagle Indus., Inc. v. Babbitt*, 215 F.3d 1344 (Fed. Cir. 1999) (table)); *Red River Holdings*, 802 F. Supp. 2d at 656, 662 (emphasis removed) (holding that FAR 52.212-4(*l*) "entitles a commercial items contractor whose contract is terminated for the Government's convenience to . . . costs reasonably incurred in anticipation of contract performance" and collecting Boards of Contract Appeals cases holding the same).

The FAR also supports treating preparatory costs as recoverable under FAR 52.212-4(*l*). For example, FAR Part 31, which establishes contract cost principles applicable to fixed-price contracts and contracts with commercial organizations, explicitly identifies "[i]nitial costs, including . . . [p]reparatory costs" as "[t]ermination costs." FAR 31.205-42(c)(2). It states that "[p]reparatory costs incurred in preparing to perform the terminated contract include such costs as those incurred for . . . management and personnel organization." *Id.* Additionally, FAR 49.201(a), which provides general principles for terminating fixed-price contracts for convenience, states that a termination settlement "should compensate the contractor fairly for the work done and the preparations made for the terminated portions of the contract, including a reasonable allowance for profit." Thus, the Court agrees with VRH's assertion that FAR 52.212-4(*l*) contemplates preparatory costs.

The Government calls the characterization of the ATO cost as preparatory a "conclusion couched as a factual allegation." Def.'s Mot. at 11 (quoting *Figueroa v. United States*, 57 Fed. Cl. 488, 497(2003)). However, VRH specifically explains why obtaining an ATO was fundamentally necessary to prepare for performance of the Contract, noting that the ATO was required by the Contract in order to receive work, addressing the potential delay in performance, and citing its concerns about its ability to compete with other awardees. Am. Compl. ¶¶ 16–17, 58, 64. Additionally, many of the pre-performance, pre-termination costs VRH lists in the

Amended Complaint are specifically for "Management Salaries," "Salaried Employees," and "Consultants and Audits," which squarely fall into the example of preparatory costs outlined in FAR 31.205-42(c)(2). *Id.* ¶ 55; *see id.* ¶ 55; FAR 31.205-42(c)(2) (referring, *inter alia*, to "management and personnel organization" as a preparatory cost).

The termination for convenience clause also requires that ATO costs result from the termination. FAR 52.212-4(*l*) (stating that recoverable charges must "have resulted from the termination"). Both parties acknowledge that VRH would have needed to offset its ATO costs through performance under the Contract, and as the Government notes, VRH was never guaranteed earnings sufficient to offset the cost. *See* Am. Compl. ¶ 58; Def.'s Mot. at 10. However, the Department's termination for convenience removed VRH's opportunity to perform and, therefore, eliminated any possibility that VRH could offset the required preparatory costs. *See* Pl.'s Ex. 2 at 6 (the Contract); Am. Compl. ¶ 58 ("Had the Contract not been terminated, the costs VRH incurred in preparing to obtain its ATO would have been recovered by the contingency fees generated over the life of the Contract."). The Government posits that this known risk was simply realized by the termination for convenience. Def.'s Mot. at 3. However, this characterization is at odds with the Government's allegation that "the ATO cost did not result from the termination." *Id.* at 11. The Amended Complaint plausibly alleges that the costs are a result of the termination, because had the Contract not been terminated, VRH would have had the opportunity to make up those costs, plus profit. Am. Compl. ¶ 58. The loss of this opportunity must be addressed by fairly "mak[ing] the contractor whole for the costs incurred in connection with the terminated work." *Nicon, Inc.*, 331 F.3d at 885 (citing *Freedom Elevator Corp.*, 85-2 B.C.A. (CCH) ¶ 17,964, at 90,032 (G.S.B.C.A. Feb. 28, 1985)); *see also* FAR 49.201.

Under the third factor for recovery of costs under the termination for convenience clause, recoverable costs cannot be those "which reasonably could have been avoided." FAR 52.212-4(*l*). The Government argues that the costs incurred in acquiring an ATO were avoidable, and therefore, VRH is precluded from recovering the ATO costs. Def.'s Mot. at 3. According to the Government, VRH "voluntarily assumed the risk that performance may not occur" because the Contract does not specifically provide for payment of the costs to obtain an ATO. *Id.* The Government explains that, under the terms of the Contract, which included a $1,000 minimum, "VRH may have had to absorb the ATO without earning performance fees sufficient to defray them in any event." *Id.* at 9–10. While the Government argues that it was possible VRH would only ever earn the contract minimum of $1,000, the contract valuation is equally relevant. The Contract was valued at over $417 million. *See* Am. Compl. ¶ 11. Thus, even if VRH was not guaranteed to earn enough profit through performance to cover the ATO costs, the valuation contemplated offsetting the costs.

VRH argues that the ATO costs were unavoidable both because the Contract required an ATO and it was necessary to start work. Am. Compl. ¶ 64. VRH notes that it could not have sought an ATO prior to contract award, but it also could not have received accounts to begin performance under the Contract until it met the ATO requirement. *Id.* ¶¶ 17, 64. Thus, to avoid undue delay, VRH needed to start the ATO process immediately after contract award. Further, VRH alleges that, under the Contract, there were risks if it did not quickly obtain an ATO prior to contract performance, including possible termination for cause and harm to ED for "leaving it

11

with one less contractor available to perform task orders." *Id.* ¶¶ 19–21; Pl.'s Resp. at 6. According to VRH, the costs were unavoidable because if VRH did not engage in "ATO preparation activities," its ability to perform under the Contract once the stop work order lifted would be adversely affected. Am. Compl. ¶ 64.

Notably, in determining which costs are recoverable, "it is 'axiomatic that one must strike a balance between the need for technical compliance with regulatory requirements and the need for basic fairness.'" *Nicon, Inc.*, 331 F.3d at 886 (quoting *Spectrum Leasing Corp. v. Gen. Servs. Admin.*, 95–1 B.C.A. (CCH) ¶ 27,317, at 136,185–86 (G.S.B.C.A. Nov. 8, 1994)). Under the Contract, the risk associated with ATO costs falls to the contractor because of the need to perform in order to offset the costs. *See* Pl.'s Ex. 2 (the Contract). The Government argues that the Contract's initial allocation of this risk precludes recovery now. Def.'s Mot. at 3–4, 7, 10. However, termination of the Contract removed a necessary element of fairness underlying the original decision to allocate the risk to the contractor: the opportunity to perform. Critically, "there are limits on the extent to which [a termination for convenience] may be used to shift the risk of unexpected circumstances to contractors." *Red River Holdings*, 802 F. Supp. 2d at 653, 660 (citing *Jacobs Eng'g Grp.*, 434 F.3d at 1381) (declining to "construe § 52.212-4(*l*) in a manner that might allocate a disproportionate share of the risk of unexpected changes in circumstances to contractors"). A contract that requires an awardee to obtain specific qualifications prior to performance, structures the terms such that the cost of the prerequisite can only be offset through performance, but ultimately denies the contractor any means to recoup the costs goes against the basic principle of fairness. *See id*; *Nicon, Inc.*, 331 F.3d at 885–86.

To survive a motion to dismiss under RCFC 12(b)(6), VRH need not conclusively prove that the costs it incurred were definitively reasonable, a result of the termination, and reasonably unavoidable; it must simply allege sufficient facts to make the conclusion plausible. For the reasons outlined above, VRH's Amended Complaint establishes a plausible claim for recovery of the ATO costs as reasonable preparatory costs that were both reasonably unavoidable and the result of the termination of the Contract. It also states a claim for recovery of its termination settlement costs.

### B.    Stop Work Order and FAR 52.233-3

Contractors often continue to incur costs in connection with a contract even after pausing performance of the contract when a stop work order is issued. *See, e.g.*, FAR 52.233-3. The FAR provides for recovery of such costs, but only in certain circumstances. *See id.* Most of the costs VRH seeks to recover are allegedly a result of this situation. *See* Am. Compl. Accordingly, although Plaintiff has stated a plausible claim for relief under the termination for convenience clause, it must also show that the terms of the stop work order do not bar recovery of ATO costs incurred during its pendency.

The stop work order here places the following limitations on costs that may be incurred while it is in effect: (1) the costs must not constitute "performance of . . . work called for by the contract"; (2) the costs must nevertheless be "allocable to the work covered by" the stop work order; and (3) VRH must "take all reasonable steps to minimize the incurrence" of such costs. Pl.'s Ex. 4 (stop work order). The contract clause at FAR 52.233-3(c), *Protest after Award*

12

(Aug. 1996), incorporated into the Contract by reference, also applies. Pl.'s Ex. 2 at 10 (the Contract). It instructs contracting officers to "allow reasonable costs resulting from the stop-work order in arriving at the termination settlement" when a contract is terminated for convenience. FAR 52.233-3(c). Thus, Plaintiff must also establish that the costs incurred were both reasonable and resulted from the stop work order.

Plaintiff must allege that it meets these requirements if it wishes to recover beyond those costs incurred between contract award (December 9, 2016) and the issuance of the stop work order (December 27, 2016), for which it states a claim under the termination for convenience clause. *See* Am. Compl. ¶¶ 11, 30. For the reasons set forth below, the Court finds that VRH also states a plausible claim for recovery of the costs it incurred during the stop work order. The facts as alleged in the Amended Complaint warrant an opportunity for VRH to demonstrate on the merits that it is entitled to costs incurred after contract award, both prior to and during the stop work order.

VRH alleges that because the costs incurred were preparatory in nature, they did not amount to "performance of . . . work called for by the contract." Pl.'s Ex. 4 (stop work order); *see* Am. Compl. ¶ 34–35, 63. The fact that ATO costs were not listed as a contract line item in Contract Section B.3, or otherwise provided for as a directly reimbursable cost, supports this interpretation. Pl.'s Ex. 2 at 5–6 (the Contract). The Amended Complaint does not describe costs associated with performance of student loan debt collection services—the services VRH sought to deliver to ED in return for payment under the Contract. Rather, it describes costs incurred to maintain a state of readiness to perform the Contract once the stop work order was lifted. *See* Am. Compl.; *4H Constr. Corp.*, ASBCA No. 59977, Apr. 17, 2019, 19-1 B.C.A. ¶ 37, 317; *Red River Holdings*, 802 F. Supp. 2d at 656, 662; FAR 31.205-42(c)(2); FAR 49.201(a). Not only does the stop work order fail to expressly prohibit VRH from incurring costs other than those connected with the "performance of work," it implicitly permits them by instructing VRH to "take all reasonable steps to minimize" such costs that are allocable to the Contract. Pl.'s Ex. 4 (stop work order).

In general, a cost is allocable to a contract if it: "(a) [i]s incurred specifically for the contract; (b) [b]enefits both the contract and other work, and can be distributed to them in reasonable proportion to the benefits received; or (c) [i]s necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown." FAR 31.201-4. It is plausible that the costs alleged in the Amended Complaint could fall under any one, or all three, of these categories. VRH, "[a]t all times relevant to this action, . . . was engaged in the business of contracting with local, state, and federal government entities to service and collect delinquent debts owed to them," and procuring an ATO—as well as the underlying qualifications required to obtain one—could prove vital to the overall operation of VRH's business. *See* Am. Compl. ¶ 2. The fact that each incumbent student loan debt collection contractor under the multiple-award IDIQ had obtained an ATO indicates that the qualifications relating to an ATO may be a necessary business operation required to remain competitive in the industry. *See id.* ¶ 16. Furthermore, even if VRH only would have been able to recover these costs by earning a performance fee, the FAR does not require VRH to link such necessary business costs to a particular cost objective or line item to show that they are allocable. *See* FAR 31.201-4(c).

Although VRH may find it challenging to prove on the merits that the costs it seeks to recover "resulted from" the stop work order, it is sufficiently plausible. If the Contract were not terminated and instead the stop work order was cancelled and performance commenced, the contracting officer would have been required to "make an equitable adjustment in the delivery schedule or contract price, or both" if the stop work order "result[ed] in an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this contract." FAR 52.233-3(b). Therefore, it follows that the type of costs the FAR contemplates as resulting from a stop work order are those associated with delays and increased costs allocable to the contract. *See id.*; FAR 52.233-3(c).

As discussed above, VRH plausibly alleges that it could not have reasonably avoided the ATO costs. Viewing all facts in the Amended Complaint as true and construing them in VRH's favor, the Court can reasonably infer that VRH had no choice but to incur the ATO costs when it did (i.e. during the stop work order) because it alleges that (1) it could not have obtained an ATO prior to contract award; (2) the Contract required an ATO in order to commence performance; and (3) due to the delay caused by the stop work order itself, VRH would face additional delays in beginning contract performance if it waited to obtain the ATO until after the stop work order was lifted, opening the door for a potential termination for default. *See* Am. Compl. ¶¶ 12–13, 17, 64. The stop work order's prohibition of performance denied VRH the opportunity to recover the ATO costs it sufficiently pleads it could not have avoided, thus resulting in VRH retaining the ATO costs.

Moreover, the Amended Complaint suggests that VRH had already begun the ATO process between contract award and the issuance of the stop work order. *See id.* ¶ 57; Pl.'s Resp. at 9. When the stop work order was issued, VRH could either halt the ATO process it had already begun or continue the ATO process during the pendency of the stop work order. The facts alleged in the Amended Complaint could support a theory that the ATO costs incurred during the stop work order "resulted from" it; the delay in performance that the stop work order allegedly would have caused once it was lifted left VRH with no other choice but to obtain an ATO during its pendency.

For this theory to apply, VRH would need to show on the merits that the delays likely to occur after the stop work order was lifted would be more than the amount of time it would have taken to obtain an ATO in the first instance. *See* Def.'s Mot. at 12 ("[I]f performance of the IDIQ contracts had begun without delay in December 2016, VRH would not have had an ATO at that time (it did not), and it would have been in the very same position if performance had commenced at a later date."). The Court can reasonably infer from the pleadings that the passage of time while the stop work order was in effect could have resulted in additional time or costs to obtain an ATO, especially if VRH would have had to repeat any of the early steps it had already taken. The law entitles VRH to this favorable inference. *See, e.g.*, *Erickson*, 551 U.S. at 93–94.

Finally, Plaintiff's Amended Complaint sufficiently alleges facts to support its position that the ATO costs were reasonable. Obtaining an ATO was a required preparatory action under the Contract, the Contract contained consequences for failing to obtain an ATO, and waiting to begin the process until after the stop work order was lifted may not have been a realistic option.

Am. Compl. ¶¶ 21, 64.  VRH also sufficiently alleges that it met the minimization requirement. *Id.* ¶¶ 33–35 (stating that VRH "repeatedly contacted the cognizant Contracting Officer to seek clarification regarding the language of the stop work order to ensure VRH was appropriately minimizing its costs"), ¶ 47 (stating that the documentation VRH submitted in support of its termination proposal "showed VRH had taken reasonable steps to minimize the costs it incurred after contract award to only those that were necessary and to which it was entitled to compensation pursuant to FAR § 52.212-4(*l*)"), ¶ 63 ("VRH incurred only those costs that were reasonable and necessary to prepare to perform the Contact.").  Therefore, the Amended Complaint states a plausible claim that VRH could recover the ATO costs incurred during the pendency of the stop work order.

## V.    Motion to Dismiss the Original Complaint

The Government has also filed a Motion to Dismiss the original Complaint.  Def.'s First Mot.  "When an amended complaint is filed, 'the new complaint supersedes all previous complaints and controls the case from that point forward.'  In such a situation, 'motions addressed to the original complaint are generally regarded as moot upon the filing of an amended complaint.'" *Sunrez Corp. v. United States*, No. 21-568, 2021 WL 3702018 (Fed. Cl. Apr. 12, 2021) (first quoting *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999); and then quoting *Thompson v. Pallito*, 949 F. Supp. 2d 558, 582 (D. Vt. 2013)).

However, the Government correctly notes that all assertions VRH made in its original Complaint, while no longer binding judicial admissions as they pertain to the present Motion to Dismiss, can still be considered evidence (specifically, admissions against interest) that the Court may consider when it engages in factfinding in future proceedings.  Def.'s Mot. at 2–3 n.1; *see also* 29A Am. Jur. 2d Evid. § 776 (2022) ("[A]s a general rule, a pleading containing an admission against the pleader . . . which has been amended or abandoned, is admissible in evidence."); 2 McCormick on Evid. § 257 (8th ed. 2022) ("Amended, withdrawn, or superseded pleadings are no longer judicial admissions but may be used as evidentiary admissions." (citations omitted)); *Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 32 (2d Cir. 2002), *overruled on other grounds by Slayton v. Am. Exp. Co.*, 460 F.3d 215 (2d Cir. 2006) ("A statement in a withdrawn complaint that is superseded by an amended complaint without the statement is no longer a conclusive judicial admission[,] [but] the factfinder may very well find that such a contradictory statement reduces the credibility of the witness." (citing *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter*, 32 F.2d 195, 198 (2d Cir. 1929))).

## VI. Conclusion

For the reasons set forth above, the Government's Motion to Dismiss the Amended Complaint is **DENIED**. The Government's Motion to Dismiss the original Complaint is also **DENIED as moot**.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge
